## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **In Re:** | § | **Substantively Consolidated** |
| | § | **Under** |
| **CANYON PORT HOLDINGS, LLC,** | § | **Case No. 12-20314** |
| | § | |
| Debtor. | § | **Chapter 11** |
| | § | |

| | | |
|---|---|---|
| **In Re:** | § | |
| | § | |
| | § | **Case No. 12-20484** |
| **CANYON SUPPLY & LOGISTICS, LLC** | § | |
| | § | **Chapter 11** |
| Debtor. | § | |

### DISCLOSURE STATEMENT FOR THE PLAN OF REORGANIZATION OF THE CONSOLIDATED ESTATES OF CANYON PORT HOLDINGS, LLC AND CANYON SUPPLY & LOGISTICS, LLC

SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
HARLIN C. WOMBLE, JR.
State Bar No. 21880300
S.D. No. 8959
NATHANIEL PETER HOLZER
State Bar No. 00793971
S.D. No. 21503
**JORDAN, HYDEN, WOMBLE, CULBRETH &
HOLZER, P.C.**
500 North Shoreline Drive, Suite 900
Corpus Christi, TX 78401
Telephone: (361) 884-5678
Facsimile: (361) 888-5555
Email: sjordan@jhwclaw.com
      hwomble@jhwclaw.com
      pholzer@jhwclaw.com
**BANKRUPTCY ATTORNEYS FOR THE DEBTOR**

**January 14, 2013**



EXHIBIT
A

## INTRODUCTION

The Debtors (as defined herein), as Debtors and Debtors in Possession, each a separate proponent of the attached Chapter 11 Plan of Reorganization, hereby file this Disclosure Statement ("Disclosure Statement") to accompany the Chapter 11 Plan of Reorganization (herein referred to as the "Plan") attached hereto as Exhibit "A" pursuant to the requirements of the United States Bankruptcy Code, 11 U.S.C. § 101, *et. seq.* and pursuant to 11 U.S.C. § 1125, for consideration by Creditors and other parties in interest as follows:

### A. Substantive Consolidation.

The Plan recognizes the substantive consolidation of the Debtors with respect to the assets, voting and treatment of all Claims and Equity Interests. The Bankruptcy Court granted the Debtors' request for substantive consolidation by Order entered on October 15, 2012 ("Consolidation Date") and with respect to the voting and treatment of all Claims and Equity Interests, on the Consolidation Date (a) all assets and liabilities of the Reorganizing Debtors shall be treated as though they were merged; (b) all guarantees of the Reorganizing Debtors of the obligations of any other of the other Reorganizing Debtor and any joint or several liability of any of the Reorganizing Debtors for any of the other Reorganizing Debtors shall be eliminated; and (c) each and every Claim or Interest against any of the Reorganizing Debtors shall be deemed filed as against the consolidated Reorganizing Debtors and all Claims filed against more than one of the Reorganizing Debtors for the same liability shall be deemed one Claim.

### B. Feasibility of the Plan

The Plan is supported by adequate information set out in this Disclosure Statement, and sufficient evidence of economic and management "feasibility" that the operations of the Debtors will result in payment of the Creditors' Allowed Claims. Additional feasibility evidence may be presented at the hearing on Confirmation of this Plan in addition to the matters set out in the Disclosure Statement.

Only Creditors who have filed Objections to Confirmation of the Plan shall be entitled to be heard at the Confirmation hearing in opposition to the Confirmation of the Plan.

### C. The Disbursing Agent and Revested Debtor

Unless expressly stated otherwise, the Plan provides that at Confirmation all assets of the Consolidated Debtors shall be revested in Revested Debtor subject only to the liens and claims ratified or created under the Plan. The Disbursing Agent will be Larry Ramming, or if Larry Ramming is unable to serve, a person appointed by the Court after notice and hearing.

Amendments and Modifications

The Plan contemplates that there may be amendments and modifications up to the date of Confirmation Order, which will be reflected in the Confirmation Order. The amendments may be simply clarifications or actual modifications of Plan treatment of Creditors. Any material modification of the Plan which has any material adverse effect on Creditors will be done on notice and hearing. However, modifications or amendments to the Plan, which are agreed to, or unopposed by, any effected Creditor or Creditor Class, and which amendment or modification does not have a material adverse effect on the feasibility of

---

Disclosure Statement                    2

the Plan, may be approved by the Bankruptcy Court without further notice other than the notice of this provision and information supplied the court at the confirmation hearing, proffers, written evidence or other testimony regarding such amendment or modification, and the opportunity for any objection to be heard at the hearing on Confirmation of the Plan as provided by law or this Plan.

## THE DISCLOSURE STATEMENT PROCESS

A Plan of Reorganization was filed with the United States Bankruptcy Court (herein the "Court," as defined in the Plan) contemporaneously with this Disclosure Statement. This Disclosure Statement will be transmitted to all Creditors and parties in interest of each respective Debtor in connection with the solicitation of acceptances of the Plan.

This Disclosure Statement has been presented to the Bankruptcy Court for approval as containing "adequate information" as required under the Bankruptcy Code. Such approval is required by statute and does not constitute a judgment by the Court as to the desirability of the Plan or as to the value or suitability of any consideration offered thereby. The Bankruptcy Court will grant the final approval of this Disclosure Statement only after you have received notice of the filing and an opportunity to be heard.

**IF YOU FAIL TO OBJECT AFTER NOTICE, YOU MAY BE FOREVER BARRED OR ESTOPPED FROM COMPLAINING OF THE ADEQUACY OF THE CONTENTS OF THIS DISCLOSURE STATEMENT.**

You are specifically referred to the terms and conditions of the Plan as filed and you are cautioned that this Disclosure Statement may not be relied upon as a substitute for a careful review and analysis of the Plan and of all supplements and amendments which may be allowed and approved. Rather, it is submitted as an aid and supplement of your review of the Plan and is an effort to explain the terms and implications of the Plan on file with the Bankruptcy Court.

**THE PLAN MAY BE AMENDED AND SUPPLEMENTED AFTER THIS DISCLOSURE STATEMENT IS FURNISHED TO YOU, UNDER AS SET FORTH IN THE BANKRUPTCY CODE AND PLAN.**

## EXHIBITS INCORPORATED INTO THE PLAN

Pursuant to the provisions of the Plan, the following Exhibits are incorporated in this Disclosure Statement as being attached hereto, and shall, upon entry of the Order Confirming the Plan (which may likewise attach to such Order one or more of the following Exhibits, as approved); be incorporated at Confirmation Date into the Debtors' Plan as if fully set forth therein *verbatim:*

**Exhibit A** -   Chapter 11 Plan of Reorganization

**Exhibit B** -   Liquidation Analysis for All Debtors (to be provided)

**Exhibit C** -   McDermott Contract

**Exhibit D** -   Funding Commitment (Ocher Energy North America, LLC")

**Exhibit E** -   Business Plan for Future Operations (to be provided)

---

Disclosure Statement                    3

**Exhibit F -**    Claims Analysis - all Debtors

**Exhibit G -**    Equity Interest after Confirmation

**Exhibit H -**    List of Plan Documents (to be provided)

**Exhibit I -**    Last Three Monthly Operating Reports

**Exhibit J -**    Settlement Agreement With Port Authority

**Exhibit K -**    Waller Defendants Pleading

**Exhibit L-**    Debtors' Authorized Expense Budget

**Exhibit M -**    reserved

**Exhibit N -**    reserved

**Exhibit O -**    reserved

**Exhibit P -**    reserved

**Exhibit Q -**    reserved

**Exhibit R -**    reserved

**Exhibit S -**    reserved

**Exhibit T -**    reserved

**Exhibit U -**    reserved

**Exhibit V -**    reserved

**Exhibit W -**    reserved

**Exhibit X -**    reserved

**Exhibit Y -**    reserved

**Exhibit Z -**    reserved

All these Exhibits should be consulted and reviewed in order to understand the Plan and this Disclosure Statement.

## REQUIREMENT TO VOTE ON THE PLAN

### D.    Ballot Deadline

The Court will fix a deadline of approximately five business days before the date set for the Confirmation Hearing as the last day by which Ballots must be received by the Debtors' Attorneys ("Ballot Deadline"). No vote received by Debtors' Attorneys after that Date will be counted. Ballots should be mailed in sufficient time to be received before the deadline. Whether or not a creditor or interest holder votes on the Plan, such person will be bound by the terms and treatment set forth in the Plan IF THE PLAN IS ACCEPTED by the requisite majorities of classes of creditors and interest holders and/or confirmed by the Court. Absent a timely vote, such creditor or interest holder will not be included in the vote tally. Allowance or disallowance of any claim or interest for voting purposes does not necessarily mean that all or a portion of the claim or interest will be allowed or disallowed for distribution of dividends purposes.

A copy of every Ballot cast concerning the Plan shall be mailed to the Debtors' attorneys and if not received by the Debtors' attorneys by the Ballot Deadline, the ballot shall not be counted.

## E.    Acceptance of the Plan

In order for the Plan to be accepted by an impaired class of Creditors, a majority in number and two-thirds (2/3) in amount of the Claims filed, allowed (for voting purposes), and voting must vote to accept the Plan. In order for the Plan to be accepted by interest holders, the two-thirds majority in amount of interests allowed (for voting purposes) and voting of each impaired class of interests must vote to accept the Plan. You are, therefore, urged to fill in all required information, to date, sign, and promptly mail the enclosed Ballot, which the Court furnished you. Please be sure to properly complete the form and legibly identify the name of the claimant or interest holder.

**EVEN IF A PARTICULAR CREDITOR VOTES TO REJECT THE PLAN, THE PLAN MAY BE APPROVED AND CONFIRMED WHICH WILL THEN BE BINDING ON ALL CREDITORS REGARDLESS OF THE REJECT VOTE OR FAILURE TO VOTE OF THAT CREDITOR.**

## F.    Solicitation

Each respective Debtor, the Creditors' Committee, or others may solicit your vote **BUT ONLY AFTER THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT.** Report any violations to the Debtors' attorneys or to the Bankruptcy Court. No representative of the Debtors shall receive any additional compensation for solicitation activities.

## G.    Filing a Proof of Claim

A Creditor or Interest Holder, in order to vote on the Plan, must have filed a proof of claim or interest at or prior to October 25, 2012 (the "Claims Bar Date"), unless such Creditor's Claim is scheduled by a Joint Debtor and is not disputed, is liquidated, and is not contingent.

Any Creditor scheduled as NOT DISPUTED, LIQUIDATED AND NOT CONTINGENT is, to the in the amount and status scheduled only, deemed to have filed a claim, and, absent objection, such claim is deemed filed and Allowed. If a Creditor files a proof of claim, that Proof of Claim will replace all scheduled claims in amount and status. If a Proof of Claim is filed or deemed filed and no objection is pending, a Creditor or Interest Holder may vote to accept or reject the Plan by filling out and mailing to the Debtors' Attorneys the Ballot, which will be provided to such Creditor. Every Creditor was timely notified of the Claims Bar Date. **Any Creditor whose Claim is subject to a pending objection must move for and secure an estimation of the Claim for voting purposes prior to the confirmation hearing or their vote will not be counted.**

## H.    Proofs Of Claim Required For Participation In Plan Distribution

---

**In order to participate in any distribution under this Plan, except as herein provided, a Creditor must have filed a Proof of Claim in the official form on or before the Claims Bar Date or be deemed to have filed one pursuant to the Plan and this Disclosure Statement.**

## I.        Objections To Claims

Nothing in the Plan or this Disclosure Statement authorizes the filing of Claims, or a right to request the late filing of Claims, after the Claims Bar Date. If no Objection is filed to a Claim prior to the deadline set out herein, such Claim shall be deemed Allowed in the amount in which it is proved and the holder of such Claim shall be entitled to obtain a distribution Order thereon. The deadline for filing objections is set forth in the Plan, and that deadline will control unless the Plan is modified or unless otherwise set by the Court in the Order Confirming the Plan or other order. Any Objection pending after Confirmation of the Plan shall be prosecuted by Revested Debtor or the Creditors' Committee or the party interposing such Objection, but only for the benefit of each respective Debtor. The expense of prosecution of such Objection shall be borne by the party making such objection.

## VOTING CONSIDERATIONS

## J.        Statutory Requirements

Section 1126(c) provides that a class of claims has accepted a plan if it is accepted by holders of claims representing at least two-thirds in amount and more than one-half in number of the allowed claims of such class that have actually voted to accept or reject the plan.

## K.        Non-Voting Classes

The Code provides that certain types of classes need not vote on a plan but rather will be deemed to have voted to accept or reject such plan. Section 1126(f) provides that a class, which is not impaired under the plan, such as a class receiving payment in full in cash upon consummation, is deemed to have accepted the plan. On the other hand, Section 1126(g) states that a class not receiving any consideration under the plan is deemed to have rejected the plan. Section 1126(b) provides that the Court may, if so requested by the proponent of the plan, confirm the plan if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class of claims or interests. The Code standard is that no junior class may receive any property until the members of a dissenting senior class have received the allowed amount of their claims or interests.

### Representations Concerning each Debtor

No representations concerning the Debtor or the Plan or inducements to vote for or against the Plan are authorized by the Debtors or allowed by law other than as set forth in this Disclosure Statement. Any representations or inducements made by any person in exchange for your vote, which are in addition to, different or other than herein contained in the Disclosure Statement as approved by the Court are made in violation of the law and should not be relied upon or acted

---

upon. Such representation or inducements should be reported to counsel for the Debtors, who shall deliver such information to the Bankruptcy Court.

## L.    Fair and Equitable Treatment

The Bankruptcy Court can confirm the Plan at the request of each respective Debtor if all the requirements of Section 1129(a) of the Bankruptcy Code except Section 1129(a)(8) are met and if at least one non-insider class of Claims that is impaired under the Plan has accepted the Plan, and if, as to each impaired class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or equity interests. "Fair and equitable" has different meanings for secured and unsecured claims and holders of equity interests.

### 1.   With Respect to a Secured Claim

"Fair and equitable" means either (i) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal to the allowed amount of its claims with a present value as of the effective date of the plan at least equal to the value of such creditor's interest in the property securing its liens, (ii) property subject to the lien of the impaired secured creditor is sold free and clear of that lien, with that lien attaching to the proceeds of sale, or (iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.

### 2.   With Respect to an Unsecured Claim

"Fair and equitable" means either, (i) each impaired unsecured creditor receives or retains property of a value equal to the amount of his allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

### 3.   With Respect to a Claim of Equity Interests

"Fair and equitable" means either (i) each impaired equity interest receives or retains on account of such interest property of a value equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (ii) the holder of any interest that is junior to the interest of such class will not receive or retain under the plan on account of such junior interest any property.

### 4.   Court Determination

In the event at least one non-insider impaired class of Claims under the Plan accepts the Plan and one or more classes of impaired Claims rejects the Plan, the Bankruptcy Court will determine at the Confirmation Hearing

whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of Claims.

## DESCRIPTION AND HISTORY OF THE DEBTORS

**M.**     **Canyon Port Holdings, LLC f/k/a Canyon Supply & Logistics LLC**

Larry Ramming and Richard Fuqua formed Canyon Port Holdings ("Canyon") on August 8, 2009. It was formed to secure a site on the gulf coast for a natural gas liquefaction plant and to operate as a deep water fueling, logistics and supply point for vessels navigating the western Gulf of Mexico and the Intercoastal canal serving the increased traffic attributable to the newly discovered Western Canyon oil and gas deposit in the western Gulf of Mexico. Port Holdings was originally named Canyon Logistics & Supply. Its name was changed to Canyon Supply & Logistics, then to Canyon Port Holdings. Canyon's initial business model was to develop a Western Gulf Supply and Logistics operation similar to Port Fourchon.

Canyon Port holdings was originally owned by LHR Trust and Fuqua Family Limited Partnership equally. The ownership of Canyon Port Holdings on the Petition Date was LHR Trust – 35%, Fuqua Family Limited Partnership – 35% and, CSL Associates LLC – 30%.

On November 22, 2010, Canyon principals entered into earnest money contract with McDermott to purchase property on Harbor Island. See Exhibit "C". Closing of the McDermott property was to occur shortly after all open items and Conditions Precedent to close had been satisfied. One of those items was a clean report from the TCEQ. McDermott felt this process would take several months. TCEQ letter was presented to Canyon in mid-2012.

In the interim, the Gulf of Mexico was closed to any deep water drilling or exploration following the BP Macondo blowout and the significant development of the Eagle Ford Shale natural gas production caused a shift in Canyon's business model away from Supply and Logistics and toward tank farm terminating operations for oil and LNG.

Canyon worked with several lenders to secure funding necessary to close. The complete capital structure included seed capital from founding principles, an additional private equity component and conventional bank financing from ING Bank, Canyon's senior lender of preference. In addition to the need for McDermott to secure the TECQ clearance letter, the funding commitment from ING was contingent on securing sufficient customer and lease commitments to satisfy lending requirements. Jody Powers, Canyon's Chief Operating Officer at the time, was charged with primary responsibility of securing sufficient customer/tenant interest to close and commence operations.

Late in 2010, Canyon was contacted by then Port Commissioner Francis Gandy who initiated discussions regarding the Port's sale of the former Naval Base at Ingleside ("NSI"). Shortly thereafter, the Port asked Canyon to bid on NSI – Canyon declined at that time, but did agree to enter into exclusive discussions with POCCA to acquire the naval base and surrounding property.

---

Disclosure Statement            8

Canyon contracted with The Clower Company for local real estate advisory services. The Clowers have been actively working on this project nearly since inception and continue to provide support to Canyon.

The Initial Earnest money contract contemplated the entire naval base and undeveloped land including small craft pier. POCCA then required Canyon to carve out the small craft pier and represented the use by Koch would not be a conflict with Canyon's intended use because Koch would only be using the additional frontage for its existing operations. Based on the numerous representations by the Port staff and agents, Canyon entering into a detailed and lengthy contract to purchase NSI and surrounding property on May 2, 2011.

Canyon secured tank farm anchor tenant under LOI based on property being "shovel ready" as represented by the Port. TXSER, the committed lessee, intended to commence construction in early 2012 on both NSI and McDermott properties. Proforma revenue from this anchor tenant alone was sufficient to secure funding on the property. Revenue was sufficient to support the transaction and exceed all loan covenants. With the additional representations made by the Port that they had numerous significant tenants lease ready, both transactions appeared to be on track.

Problems with wetlands on the NSI site and inability of McDermott to secure the TECQ clearance letter were significant hurtles that were slowing down the ability to meet the timeline of TXSER, who withdrew its intention to lease. No additional lessees were forth coming from the Port.

Canyon engaged the specialty investment bank and advisory group Galway to provide investment banking services and consulting expertise on use of the property for gas to liquids operations as an LNG and LPG facility as an alternative to tank farms. Waller Marine initially approached Canyon about a long-term lease of the entire McDermott facility for the creation of a shipyard. Waller Marine, upon learning of the NSI site also expressed interest in it as a LNG facility, which would be jointly owned by Canyon and Waller with Waller leasing the location and constructing an LNG facility on it. That would also leave space of a logistics service as originally planned. Waller introduced Diversity Max to Canyon who, along with Waller would joint venture to create the LNG facility. The joint venture would be the anchor tenant on the NSI facility for a liquefaction facility and Waller shipyard would be the anchor tenant on the McDermott facility. Diversity Max agreed to provide all necessary funding to close on the properties.

Canyon, Diversity Max and Waller attended the closing in Corpus Christi on the NSI property. All necessary closing documents were executed to finalize the transaction, but Diversity Max never funded, despite its assurances that the funds were "on the way". The Port terminated the contract to purchase NSI.

The failure of Diversity Max to meet its commitment to fund the NSI transaction made it clear that the promises to fund the McDermott transaction were lies as well. Canyon sought alternative funding through its efforts and working with others including formal engagements with the Galway Group, Pritchard Capital, and later Imperial Capital.

---

Disclosure Statement          9

While interest in both transactions was steady and strong, Canyon had not secured a replacement lender when McDermott provided notice of the resolution of the last of the open issues on the contract and our requirement to close and fund within 45 days.

On June 10, 2012 Canyon entered into Chapter 11, listing both the NSI and McDermott contracts and claims against Waller and Diversity Max as assets.

Since that time, Canyon has remained in active discussions with potential lenders/strategic partners and has been working to secure funding for the McDermott acquisition. In January 2013 Canyon secured a Funding Commitment letter from OCHER ENERGY NORTH AMERICA ("OENA") (Exhibit "D"). Commitment calls for a timely closing and funding subject to typical industry standard due diligence. OENA is part of a much larger alliance focusing on the development and sale of LNG in North America and other free trade neighboring nations. In addition to OENA, Canyon is far along and in active discussions with other prospective lenders and potential strategic partners who have expressed significant interest in the opportunity.

Canyon Port Holdings is requesting the Bankruptcy Court allow the Assumption of the McDermott Contract allowing the Debtor to finalize that transaction, using the proceeds of the 44M dollar loan from OENA, set out in Exhibit D, to pay off all Creditors in this Bankruptcy case in full and proceed to develop the LNG and supply facility envisioned for this real Estate. In the process the development and operations will create several hundred high paying jobs in the Costal Bend.

### N.    Canyon Supply & Logistics LLC

Canyon Supply & Logistics LLC ("Supply") was formed on December 15, 2011. It was formed to be the clean entity to own NSI, which was under contract to purchase by Canyon Port Holdings. The deal at closing would have had Canyon Supply & Logistics owned by Canyon Port Holdings and several entities created by the lender Diversity Max and the Industry partner, Wailer Marine, Inc.

The ownership of Canyon Supply & Logistics on the Petition Date was LHR Trust – 35%, Fuqua Family Limited Partnership – 35% and, CSL Associates LLC – 30%.

### O.    Litigation and other claims

#### 1.    Claims against Port of Corpus Christi Authority

Post-filing, Canyon shifted its primary focus toward a resolution of the NSI contract and claims against the Port Authority. Canyon filed its initial Schedules and Statement of Affairs on July 9, 2012. On August 6, 2012, Canyon amended its Schedules to allege that it owned an interest in portions of the Property and that the Second Canyon Contract remained executory and would be assumed by Canyon Holdings. The Port Authority filed its Motion Concerning Automatic Stay on August 18, 2012. Canyon engaged the Port Authority in negotiations surrounding the viability of assumption of the NSI contract and resolution of the Claims that Canyon had against the Port Authority arising from its dealing in conjunction with the NSI contract.

Late in 2012, Canyon and the port reached a settlement whereby the Port paid Canyon $3.5 million for a complete release. That settlement was executed. Net settlement proceeds of approximately $2.1 million currently reside in Canyon's DIP account.

### 2. Claims against Waller Marine, Inc., Diversity Max, and Jeffery Greenwalt

Waller Marine, Inc. ("Waller"), Diversity Max, and its principal Jeffery Greenwalt and others (collectively, "Waller Defendants") were the people who defaulted on their promises to lend to and partner with Canyon in its acquisition and development of the NSI and the McDermott tracts. The actions of these parties were a causal source of tens of millions of dollars worth of damage to Canyon and the prime cause of Canyon's failure to close the NSI and McDermott transaction and paying its creditors in full and in a timely manner. But for that failure this bankruptcy would never have been necessary. The facts supporting the claims against the Waller Defendants are set out in detail in the pleadings of the lawsuit filed against them and attached hereto as Exhibit K.

### 3. Bankruptcy Court Approve the Assumption of the McDermott Contract

The Debtors request that in the Confirmation Order issued in conjunction with Confirmation of the Debtors' Plan and pursuant to sections 105 and 365(a) of the Bankruptcy Code granting authority for the Debtors to assume the executory contract for the purchase of the real estate commonly known as the McDermott Track. The contract is titled "Real Estate Purchase and Sale Contract", dated November 22, 2010 (the "McDermott Contract") and attached as Exhibit "C", and fixing and authorizing the Debtor to cure any existing defaults of the Debtor to the McDermott Contract.

On August 8, 2009 Canyon Port Holdings was formed to secure a site on the gulf coast for a natural gas liquefaction plant to operate and a fueling and supply point for vessels navigating the western Gulf of Mexico. On October 22, 2010 Canyon Port Holdings secured an earnest money contract of a tract on Harbor Island from McDermott, for that purpose.

Canyon worked with several lenders to secure funding necessary to close. The complete capital structure included seed capital from founding principles, an additional private equity component and conventional bank financing from ING bank, Canyon's senior lender of preference. In addition to the need for McDermott to secure the TECQ clearance letter, the funding commitment from was contingent on securing sufficient customer and lease commitments to satisfy lending requirements.

Canyon Port Holdings shared the availability of the Harbor Island facility with prospective partners and discovered interested parties who wanted a land based tank farm facility with water access, which would fix perfectly on this site. Canyon Port Holdings set out to secure a contract for the lease of that facility to support the necessary borrowing to close the McDermott Contract.

---

Disclosure Statement        11

Canyon secured tank farm anchor tenant under LOI based on property being "shovel ready" based on the representation of McDermott that meeting the TECQ clearance requirement would take about 6 months. TXSER intended to commence construction in early 2012 on both NSI and McDermott properties. Proforma revenue from anchor tenant alone was sufficient to secure funding on the property. Revenue was sufficient to support transaction and exceed all loan covenants.

Problems with the ability of McDermott to secure the TECQ clearance letter were significant hurtles that were slowing down the ability to meet the timeline of TXSER, who withdrew its intention to lease.

Canyon engaged the specialty investment bank and advisory group Galway to provide investment banking services and consulting expertise on use of the property for gas to liquids operations as an LNG and LPG facility as an alternative to tank farms. Waller Marine initially approached Canyon about a long-term lease of the entire McDermott facility for the creation of a shipyard.

Waller introduced Diversity Max to Canyon who, along with Waller would joint venture to create the LNG facility. The joint venture would have been the anchor tenant on the NSI facility for a liquefaction facility and Waller shipyard would be the anchor tenant on the McDermott facility. Diversity Max agreed to provide all necessary funding to close on the properties.

Diversity Max did not come up with the funds to close the NSI transaction and both Waller and Diversity Max notified Canyon that neither would honor their commitments on the McDermott Contract.

On June 1, 2012, McDermott tendered closing documents to the title company and notified Canyon that McDermott believed that Canyon was in default under the contract and that McDermott, may in the future, choose to exercise its power to terminate the contract if Canyon did not close on or before June, 11, 2012. Prior to any attempt to terminate the McDermott Contract Canyon, on June 10, file this Chapter 11 bankruptcy.

The fact that the McDermott Contract is an Executory Contract is not in dispute. The only issue that is disputed by McDermott is whether or not Canyon can meet the requirements of the Bankruptcy Code to allow Assumption.

## GROUNDS FOR RELIEF

**A.    Authorization of Debtor to Assume an Executory Contract.**

Under 11 U.S.C.A. § 365(a), "[a] trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease term of the debtor." Since 11 U.S.C.A. § 1107(a) gives debtors-in-possession the same rights and powers of a trustee, a debtor-in-possession also may assume a contract with bankruptcy court approval. The purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee

---

Disclosure Statement                    12

or debtor-in-possession to use valuable property of the estate and to "renounce title to and abandon burdensome property." 2 Collier on Bankruptcy P 365.01[1] (15th ed. 1993) if the trustee or debtor-in-possession rejects an executory contract pursuant to § 365, "the other party to the rejected contract becomes a general creditor of the estate for any damages flowing from the rejection." **Matter of Minges**, 602 F.2d 38, 41 (2d Cir. 1979).

In short, § 365 permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject. **In re Orion Pictures Corp.**, 4 F.3d 1095, 1098, (2d Cir. 1993), cert. dismissed, 511 U.S. 1026, 114 S. Ct. 1418, 128 L. Ed. 2d 88 (1994).

A motion to assume or reject is a contested matter designed to review the trustee' or debtor's decision to assume or reject a particular contract in the course of the swift administration of the bankruptcy estate. **In re Orion Pictures Corp.**, 4 F.3d 1095, 1098, 123 A.L.R. Fed. 681 (2d Cir. 1993), cert. dismissed, 511 U.S. 1026, 114 S. Ct. 1418, 128 L. Ed. 2d 88 (1994).

Pursuant to the Bankruptcy Code, the Debtor may assume an executory contract if it: (i) cures, or provides "adequate assurance" that it will promptly cure its defaults; (ii) compensates, or provides "adequate assurance" that it will promptly compensate for any actual pecuniary loss resulting from any default; and provides "adequate assurance of future performance" under the Lease. 11 U.S.C. §365(b)(1).

The assumption may be accomplished through the debtor's plan (as in this case) or the Amended Motion. 11 U.S.C.A. § 1322(b)(7) and Code Rule 6006.1   Thus, a trustee (or Debtor in Possession), subject to court approval, can assume or reject executory contracts and unexpired leases. If there exists a prior default, the trustee must do the following to assume the agreement:

> 1)   Cure the default, or provide adequate assurance that the default will be promptly cured,
> 2)   Compensate or provide adequate assurance of compensation to any party to the contract or lease for any pecuniary loss to such party resulting from the debtor's default, and
> 3) Provide adequate assurance of future performance.

**In re Carlisle Homes, Inc.**, 103 B.R. 524 (Bankr. D.N.J. 1988) recites the rule that "adequate assurance of future performance," adopted from UCC § 2-609(1), is "to be given a practical, pragmatic construction based upon the facts and circumstances of each case." See, also **In re Belize Airways Ltd.**, 5 B.R. 152, (Bankr. S.D. Fla. 1980).

The valuable executory contract, which can be assumed under the Bankruptcy Code. It has substantial value and the Debtor has the ability to:

---

[1]    Assumption, through the plan or separate motion must only meet the requirements of § 365. *See*, **In re Ford**, 159 B.R. 930 (Bankr. W.D. Wash. 1993); **In re Wallace**, 122 B.R. 222 (Bankr. D. N.J. 1990) including cure and adequate assurance. 11 U.S.C.A. § 365(b)(1).

---

Disclosure Statement        13

1)      Cure the default, or provide adequate assurance that the default
will be promptly cured,

2)      Compensate or provide adequate assurance of compensation to any
party to the contract or lease for any pecuniary loss to such party resulting
from the debtor's default, and

3) Provide adequate assurance of future performance.

**P.    Significant Events During The Pendency Of The Chapter 11 Cases**

### 1. Settlement With Port Authority

On September 6, 2012, the Court entered and Order granting its approval of the
Settlement Agreement between the Port Authority and Canyon.

On November 8, 2012, the Port Authority funded the 3.5 million dollars as agreed to in
the Settlement Agreement.

### 2. Disposition of the Settlement Proceeds

On November 5, 2012, Canyon filed a Motion to Approve Deposit of the Settlement
proceeds into the DIP account of the Debtor. The Bankruptcy Court entered an Order
approving that deposit, but restricting the use of the Settlement proceeds to disbursements
specifically approved by the Court. From the $3.5 million dollars deposited in the DIP
account, the Court approved the disbursement of $1,403,701.11 to Special Counsel for
their fees and expenses, and authorized the disbursements from the settlement proceeds to
reimburse specific ongoing expenses of the Debtor as set out in the budget in Exhibit L.

Additionally the Court has approved the payment of interim fees and expenses of the
General Counsel for the Debtors, Jordan, Hyden, Womble, Culbreth and Holzer, PC of
$37,903.50 in fees and $1,888.52 in expenses paid from a retainer and from the
Settlement Proceeds.

There currently remains $2,064,102.03 in the DIP account of the Debtor; $2,060,559.97
is attributable to the Settlement proceeds.

### 3. McDermott's Motion to Lift Automatic Stay

On September 14, 2012, McDermott filed a Motion to Lift the automatic stay.
McDermott was of the belief that lifting the stay would allow it to proceed to terminate
the McDermott Contract, Exhibit C, covering the Harbor Island track. Both parties agree
that the contract has not been terminated and is therefore an executory contract,
McDermott wanted to get the Court's permission to terminate it. The Debtor wishes to
assume and perform the contract. The Bankruptcy Court denied the Motion to Lift, but in
its Order required that the Debtor file its Plan and Disclosure Statement on January 14,
2013 setting out its intention as to the McDermott Contract and in those documents
establish a reasonable possibility that the Debtor could perform under the contract. The
Court was focused on the Debtor's ability to pay the 30 Million dollars purchase price.
This Disclosure Statement and the accompanying Plan meet the Court's requirements to

Disclosure Statement                                    14

establish that The Debtor can, timely cure all defaults and perform the requirements of it under the contract, as set out in the Bankruptcy Code.

### 4.  Claims Bar Date

On September 25, 2012, the Court entered its Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors & Deadlines, setting a bar date October 25, 2012.

### 5.  Retention of Professionals

9/11/2012 [Doc #50]
Order Authorizing Employment and Retention of Jordan, Hyden, Womble, Culbreth & Holzer, PC as Counsel for Debtors In Possession

9/11/2012 [Doc #51]
Order Granting Application of Debtor For The Approval Of Retention Of Retention of Sico, White, Hoelscher & Braugh L.L.P. and Jordan, Hyden, Womble, Culbreth & Holzer, P.C. as Special Litigation Counsel for Claims against the Port Authority and Waller Defendants.

11/26/2012 [Doc #182]
Order Granting Application to Employ The Clower Company as Real Estate Brokers on McDermott Property

### 6.  Monthly Operating Reports

The Debtors' Monthly Operating Reports have all been timely filed on a consolidated basis as agreed to with the US Trustee. The three most recent MORs are attached hereto as Exhibit I.

### 7.  Resolution of Clower Litigation

On October 2, 2012, the Clower Group made demand, through the Clower Group's attorney Christopher Bandas, upon the individually-named Port Commissioners and the Port, purportedly "as agent" for Canyon. The Port Authority informed the Debtor that the threat from the Clower Group would prevent the closing on the NSI property by Oxy an would block the trigger of the payment of 3.5 Million dollars to the Debtor under the Settlement Agreement preciously entered into and approved by the Court. On October 10, 2012, the Debtor filed its Complaint For Declaratory Relief, Temporary, Interim And Permanent Injunctive Relief, And Damages Arising From Knowing And Intentional Violation Of 11 USC Sec. 362, For Breach Of Contract And Breach Of Fiduciary Duty with the Bankruptcy Court. On that same day, the Court entered a TRO preventing the Clower Group from continuing to pursue its claims against the Port Authority.

On October 24, 2012, the Clower Group and the Debtor reached and executed a Settlement Agreement, which was approved by the Bankruptcy Court by Order, entered on October 30, 2012. The Clower Company was given a $50,000.00 liquidated Unsecured Claim in the bankruptcy.

Disclosure Statement                         15

### 8. Extension of Exclusivity

Exclusivity was extended twice until January 14, 2013.

### Q.    Present Condition Of Consolidated Debtor

The Consolidated Debtors' most recent consolidated Monthly Operating Reports are attached as Exhibit I. There were no material financial changes since these reports were filed.

The Consolidated Debtors have $2,064,102.03 cash in the DIP bank account and is actively pursuing the Waller Defendants to reduce that asset to cash.

The ongoing expenses of the Debtor are set out in Exhibit L.

## THE CONSOLIDATED CHAPTER 11 PLAN

### R.    Definitions Contained In The Plan

The Plan contains definitions, which must be reviewed for a complete understanding of the Plan and the Disclosure Statement. Capitalized terms used herein, if not separately defined, have the meanings assigned to them in the Plan or in the Bankruptcy Code. All persons receiving the Disclosure Statement and the Plan are urged to review fully the provisions of the Plan and all attached appendices and exhibits, in addition to reviewing this Disclosure Statement.

### S.    Summary Of The Plan

a. Allowed Administrative Claims will be paid as they come due or by agreement between each Debtor and each such administrative claimant. No such claim exists.

b. Allowed Secured Tax Claims shall be paid in full to the extent of the value of the collateral securing the claims and any excess shall not be entitled to any distribution under the Plan. No such claim exists.

c. Allowed Priority Claims against the Debtors shall be paid from the assets of the Estate to the extent such assets are available, and if insufficient assets are available to pay such claims in full, any remaining balance shall share pro rata in the General Unsecured Liquidation Fund. There are approximately $47,000.00 Allowed Priority Claims.

d. The Purchase Contract with McDermott is Assumed and any defaults that exist under that contract will be cured and the obligations under that contract shall be treated as an Administrative Claim as set out in the Plan. No such claim will be Allowed.

e. The Allowed Secured Claim, if any, will be paid in accordance with the terms and conditions of this Plan. There are approximately $1,000,000.00 General Unsecured Claims.

f. Allowed general unsecured claims shall share pro rata in the General Unsecured Liquidation Fund.

---

Disclosure Statement         16

g. All assets of the Revested Debtor shall be pledged to the obligations under this Plan and to the extent necessary used to make payments under the Plan.

h. All Pre Petition Claims of any Insider are subordinated to all other classes of claims and shall receive nothing under the Plan until all other Classes Creditors are paid in full.

i. All Equity Interest Claims in the Debtors shall receive a like interest in the Revested Debtor, encumbered with any obligations to fund value for the equity interest as it existed prior to the Petition Date to the extent that the Equity Interest Claim is an Allowed Equity Interest Claim.

### T.    Rules of Interpretation for Plan Summaries

If there is any conflict in the terms of these plan summaries with the Plan, or with the Order Confirming the Plan, then the terms of the Plan, or the Order Confirming the Plan, shall govern.

### RISKS OF PLAN AND PERFORMANCE

All Chapter 11 reorganizations inherently have risks. These risks must be considered and evaluated by a Creditor in its decision to accept or reject the proposed Plan. The discussion of the inner workings of the Plan and examination of the inherent risks is an essential purpose of this Disclosure Statement. However, the Plan performance is likely, and should not result in a need for further reorganization.

The Debtor Plan does not entirely eliminate the reliance upon the Reorganized Debtor's operations for funding. However, if the Debtor the Plan as drafted is confirmed the risks will be almost entirely on the Insiders of the Debtors. The current funds on hand will; assuming there are no unanticipated Secured Claims, Priority Claims or Administrative Claims; be adequate to pay the General Unsecured Creditors in full upon Confirmation. The assumption and closing of the McDermott Contract through the credit extended from the Funding Commitment, Exhibit D, will allow full payment to all creditors, eliminating any reliance on either the future operations of the Revested Debtor or recovery on the Waller Defendants Petition.

If the Debtor is successful in assuming and closing the McDermott Contract all Creditors will be paid in full in a few months, and the active participation in the process of pursuing the litigation against the Waller Defendants by existing principals is far more efficient than a liquidation by a Trustee under Chapter 7 for at least the following reasons:

a.    there is no Trustee's fee being assessed on the assets and property of the affected estates;

b.    the values realized are not depressed by lack of interest on behalf of the Interest Holders of the reorganizing companies;  and

---

c.     Liquidation in Chapter 7 would prevent any chance at realizing any value out of the McDermott Contract.

## LIQUIDATION ALTERNATIVES AND ANALYSIS

### U.     General Discussion

If the Plan is not confirmed, Debtors' chapter 11 cases may be converted to cases under Chapter 7 of the Bankruptcy Code. In a Chapter 7 case, a trustee would be elected or appointed to continue operations or liquidate Debtor's assets. The proceeds of the liquidation, augmented by Debtor' cash and any recoveries from third parties, would be distributed to the respective holders of Claims in accordance with the priorities established by the Bankruptcy Code. The necessity for rapid wind down in a liquidation under Chapter 7 would require a Chapter 7 Trustee to retain new professionals to evaluate the assets of the Estate and advise on how to proceed. Additionally, the Trustee will have to incur significant expenses to get up to speed. Debtors believe that the proceeds received by a Trustee pursuant to resolution of the only asset that the Trustee will have that can effectively be monetized will be worth much less than that received pursuant to the Plan. Most importantly, there is no possibility of a quick payout by the assumption and closing of the McDermott Contract by the Trustee.

The Debtors' Liquidation Analysis, which sets out what the Debtors believes would happen if the case was converted, is attached as Exhibit B.

### V.     Preservation Of Business as Going Concerns

The Debtors believe that it is easy to determine that preservation of the going concern will generate a far greater likelihood of quicker pay out than a liquidation. Further, although the Chapter 7 Trustee is entitled to operate the business in a liquidation, it is unlikely that the Trustee could obtain lending to close the McDermott Contract or would be as effective in pursuing the Waller Defendants.

**THE DEBTORS BELIEVE THAT IN A CHAPTER 7 LIQUIDATION AND ADDITIONAL POST-PETITION ADMINISTRATIVE EXPENSES WOULD REDUCE THE AMOUNT AVAILABLE TO CREDITORS.**

### W.     Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest in the case could attempt to formulate and propose a different plan or plans.

Such plans might involve either a reorganization, continuation of Debtors' businesses, a sale of assets, establishment of a liquidating trust to hold Debtors' assets, liquidation of Debtors' assets or a combination thereof. Debtors believe, however, that substantial time would be required to negotiate and consummate any other transaction involving a disposition of Debtors' assets other than the current plan and continued involvement of current management. During this period continued operations would be doubtful, an would likely result in a diminution of the value of Debtors' assets and, Debtors believe, a resulting

---

Disclosure Statement                                  18

decrease in the proceeds of any such disposition or dispositions available for distribution to creditors as compared with distributions pursuant to the Plan.

## TAX CONSEQUENCES

The purpose of this provision to provide a discussion of the potential material Federal income tax consequences of the plan to Debtors, to the Reorganized Debtors, and the hypothetical holders of claims or interests in the case that would enable such a hypothetical investor to make an informed judgment about the Plan, as contemplated in 11 U.S.C. § 1125(a)(1). The Federal income tax consequences discussed herein are those arising under the Internal Revenue Code of 1986, as amended (the "Tax Code") and the income tax regulations promulgated thereunder, (the "Regulations") and case law, revenue rulings, revenue procedure and other authority interpreting the relevant sections of the Tax Code and the Regulations.

This summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as taxpayers who are not United States domestic corporations or citizens or residents of the United States, S corporations, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, broker-dealers, non-profit entities or foundations, small business investment companies, persons that hold Claims or Equity Interests as part of a straddle or conversion transaction and tax-exempt organizations).

The Debtors are each pass-through entities, that is, the equity owners report all items of income, gain, loss, deduction and credit. The entities file returns of income, but the entities are not liable for federal income tax.

The Debtors believe there are no tax implications that arise from the substantive consolidation of the Debtors. However, no administrative rulings will be sought from the Internal Revenue Service ("IRS") with respect to any of the federal income tax aspects of the Plan. Consequently, there can be no assurance that the treatment described in this Disclosure Statement will be accepted by the IRS. No opinion of counsel has either been sought or obtained with respect to the federal income tax aspects of the Plan.

**THE DISCUSSION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR GENERAL INFORMATION ONLY. ALL CREDITORS AND EQUITY HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE FEDERAL INCOME TAX CONSEQUENCES CONTEMPLATED UNDER OR IN CONNECTION WITH THE PLAN, AS WELL AS STATE AND LOCAL TAX CONSEQUENCES AND FEDERAL ESTATE AND GIFT TAXES.**

## THE PLANS AND PROJECTED DISTRIBUTIONS

## X.    TREATMENT OF UNCLASSIFIED CLAIMS APPLICABLE TO ALL DEBTORS

---

Disclosure Statement        19

### 1. Fees of the United States Trustee and the Clerk of the Court

All U.S. Trustee fees and any fees of the Clerk of the Court shall be paid in cash as they come due or if any remain unpaid then in cash in full upon Confirmation. All post-confirmation U.S. Trustee's fees shall be paid in cash in full as they come due until entry of a final decree. The Bankruptcy Court shall hear any dispute with respect to such payments. This Claim is an administrative cost and expense of Administration for which no proof of claim is required to be filed. Adequate cash on hand exists to pay all such claims in full.

### 2. Administrative Claims of Estate Professionals

Each Administrative Claim for Professionals fees shall be paid in full in Cash on the later of (a) the Effective Date, (b) fifteen (15) days after the Administrative Claim is approved by Final Order of the Bankruptcy Court, in relation to Administrative Claims requiring Bankruptcy Court approval, or (c) in the ordinary course of business in accordance with any related agreements, in relation to Administrative Claims that represent Debts incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and as to which approval of the Bankruptcy Court is not required by the Bankruptcy Code.

The holder of an Administrative Claim other than (a) an Administrative Claim which has already been approved by the Bankruptcy Court by Final Order, (b) an Administrative Claim which represents a Debt incurred by the Debtors in the ordinary course of business and which does not require Bankruptcy Court approval, or (c) an Administrative Claim which represents a fee or charge assessed against the Debtor's Estate under Chapter 123 of Title 28, United States Code; must on or before thirty (30) days following the Effective Date (the "Administrative Claim Bar Date"): (i) file an application for allowance of such Administrative Claim ("Administrative Claim Application") with the Bankruptcy Court; and (ii) serve a copy of such Administrative Claim Application on the Debtors, the Debtors' attorney, and the U.S. Trustee. Failure to timely file and serve an Administrative Claim Application by the Administrative Claim Bar Date shall result in the Administrative Claim being forever barred and discharged. The deadline for objecting to an Administrative Claim Application shall be twenty-one (21) days after the filing of the Administrative Claim Application, and such objection must be filed with the Bankruptcy Court and served on the Administrative Claim applicant by such deadline. In the absence of a timely filed and served objection to a particular Administrative Claim Application, the Bankruptcy Court shall treat the Application as unopposed and may approve it without the necessity of conducting a hearing thereon. In the event of a timely objection to a particular Administrative Claim Application, the Administrative Claim sought for approval pursuant to such Application shall only become an approved Administrative Claim to the extent approved by Final Order of the Bankruptcy Court. Adequate cash on hand exists to pay all such claims in full.

### 3. Administrative Claims

---

The Confirmation Order will establish that the Administrative Claims Bar Date for filing of all Administrative Claims (but not including Professional Fee Claims or claims for the expenses of the members of any Committee) will be thirty (30) days after the Effective Date. Holders of Administrative Claims, other than Professional Fee Claims, claims for U.S. Trustee fees under 28 U.S.C. §1930, administrative tax claims and administrative ordinary course liabilities, must submit a requests for payment of such Administrative Claim on or before such Administrative Claims Bar Date or forever be barred from recovering on account of such Claim. A notice prepared by the Debtors will set forth such date and constitute good and sufficient notice of the Administrative Claims Bar Date. Interested Parties, as applicable, shall have twenty one (21) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the filing of any request for payment of an Administrative Claim to review and object to such Administrative Claims before a hearing for determination of allowance of such Administrative Claims. Holders of Administrative Claims pursuant to section 503(b)(9) of the Bankruptcy Code are required to file proof of such a claim on or before the Administrative Claims Bar Date. Adequate cash on hand exists to pay all such claims in full.

### 4. Administrative Compensation Claims

Each Allowed Administrative Regular Compensation Claim shall be paid in full when due and if unpaid on the Effective Date shall be paid in full within 30 days of the Effective Date; provided that, any particular claimant may agree to deferred pay out. These Claims are administrative costs and expense of Administration for which no proof of claim is required to be filed. Adequate cash on hand exists to pay all such claims in full.

### Y. CLASSIFICATION AND TREATMENT OF IMPAIRED AND UNIMPAIRED CLAIMS AND INTERESTS

### Class 1 – Secured Tax Claims - IMPAIRED

Each holder of an Allowed Class 1 Secured Tax Claim shall receive on account of its Allowed Secured Tax Claim either (i) surrender of the collateral securing the holder's Allowed Secured Tax Claim, or (ii) payment in full of such Allowed Secured Tax Claim on or as soon as practicable after the later of: (A) the Effective Date, or (B) the date on which such Secured Tax Claim becomes an Allowed Secured Tax Claim, or (iii) such other treatment agreed to by the holder of such Allowed Secured Tax Claim and the Debtor, provided such treatment is on more favorable terms to the Debtor, than the treatment set forth in clauses (i) or (ii) hereof. Each Debtor, shall have the right, in its sole discretion, to prepay Allowed Secured Tax Claims without penalty of any sort or nature. Any deficiency claim shall receive no distribution.

Class 1 is Impaired. Holders of Claims in this Class shall be entitled to vote to accept or reject the Plan. No Class 1 Claims are known at this time.

### Class 2 - Priority Claims - IMPAIRED

---

Disclosure Statement      21

Class 2 Claims shall include those Allowed Claims entitled to Priority under Bankruptcy Code Section 507(a) and such penalty and interest as may be Allowed, if any, under the Bankruptcy Code. and shall be paid at the option of the Revested Debtor the lesser of all estate assets, Pro Rata, or 100% of the Allowed amount of the claim:

      (i)     as soon as practicable after the Effective Date of the Plan; or

      (ii)    within 30 days after Allowance.

In the event any Debtor's estate assets are insufficient to pay 100% of the Allowed amount of all 2 Creditors' Allowed claims, then the unpaid portion of all such Creditors' Allowed Claims, without interest, shall be treated as a Claim in the General Unsecured Liquidation Fund and shall be entitled to distribution there from, if any.

If estate assets are available to pay interest, interest shall begin to accrue on the Effective Date and shall be paid on the principal amount of the Tax Claims at the rate of 5% per annum, and such interest shall be paid together with each annual installment of principal. The interest rate may be approved or adjusted by the Court at the hearing on Confirmation of the Plan.

Class 2 is Impaired. Holders of Claims in this Class shall be entitled to vote to accept or reject the Plan. There are approximately $47,000 of Allowed Priority Claims.

### Class 3 – Rejection Claims - IMPAIRED

Class 3 Claims shall include those Allowed Claims arising from rejection of a lease, contract, or other agreement, whether such claim is filed pre or post confirmation. All such Allowed Claims shall treated as Claims in the General Unsecured Liquidation Fund.

Class 3 is Impaired. Holders of Claims in this Class shall be entitled to vote to accept or reject the Plan. No Class 3 Claims are known at this time.

### Class 4A – Allco LLC. Allowed Secured Claim - UNIMPAIRED

The Allowed Secured Claim of Allco LLC, will be paid in full from the cash on hand on the Effective Date.

Class 4A is Unimpaired. The Holder of Claims in this Class shall be deemed to have voted to accept the Plan. No Class 4A Claims are believed to exist.

### Class 4B – Other Secured Claims - UNIMPAIRED

All other Allowed Secured Claims, if any, shall be paid in full from the Cash on hand or at the Debtor sole discretion be entitled to return of any collateral securing the Claims, if any, and the right to file a deficiency claim, which, if Allowed, shall share pro rata in the General Unsecured Liquidation Fund.

Class 4B is unimpaired. Holders of Claims in this Class shall be deemed to have a vote to accept the Plan. No Class 4B Claims are known at this time.

---

Disclosure Statement           22

Canyon Holdings DS - show_temp.pl   Case 2:13-cv-00066   Document 1-1   Filed on 03/08/13 in TXSD   Page 23 of 39 ...0709683-0-txs...

Case 12-20314   Document 193   Filed in TXSB on 01/14/13   Page 23 of 39

### Class 5 – General Unsecured Claims - IMPAIRED

Class 5 Unsecured Claims consists of all unsecured debt, including deficiency claims, if and when Allowed. Class 5 Unsecured Creditor Allowed Claims shall be paid their pro rata share of the General Unsecured Fund until paid in full. Payment in full shall include interest calculated at 5% per annum on the unpaid amount of the Allowed claim from the Effective Date to the date of final payment.

Class 5 is Impaired. Holders of Claims in this Class shall be entitled to vote to accept or reject the Plan.

### Class 6 – Insider's Claims and Subordinated Claims

Allowed Claims owed to an Insider as that term is defined in the Plan shall receive nothing under the Plan until such time as all superior classes, 1 through 5 are paid in full. At such time the Allowed Insider Claims shall be paid pro rata from the Fund until paid in full.

Class 6 is Impaired. Holders of Claims in this Class shall be entitled to vote to accept or reject the Plan but said vote may or may not be counted for meeting the voting requirements of the Bankruptcy Code for Confirmation. If an insider as defined in the Bankruptcy code owns the claim, votes of such claims will not count toward the voting requirements for Confirmation.

### Class 7 -  Equity Interest Holders NON VOTING, UNIMPAIRED

The Equity ownership of the Revested Debtor shall be in the same amount and held by the same people who owned that interest prior to the Petition Date. All obligations owed to the Debtor for the ownership of the equity interest shall still be due.

This Class is unimpaired and deemed to have voted to accept the Plan..


## IMPLEMENTATION AND EXECUTION OF THE PLANS


## Z.  PROVISIONS FOR REJECTION OR ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### Assumed Executory Contracts and Unexpired Leases

Effective upon Confirmation Date, the Reorganizing Debtors affirm all the following executory contracts and unexpired leases:

McDermott Contract

### Rejected Executory Contracts and Unexpired Leases

Effective upon Confirmation Date, the Debtors reject all the following executory contracts and unexpired leases:

The Debtors believe there are none except the McDermott Contract assumed above. If there are the Debtors rejects them.

---

Disclosure Statement                              23

**Executory Contracts and Unexpired Leases Deemed Rejected**

Debtors reserve the right to affirm or reject pursuant to Section 365 of the Bankruptcy Code any executory contract or unexpired lease not specifically affirmed or rejected by this Plan.

Any executory contract or unexpired lease not specifically affirmed or expressly rejected by this Plan shall be deemed by this Plan to be rejected on the Effective Date. Otherwise, and in all other cases, Creditors as parties to any contract rejected under this Plan shall have up to 30 days after the Effective Date in which to file a Proof of Claim for Damages, if any, resulting from such rejection or be forever barred from asserting any Claim.

**Filing Proofs of Claim for Rejected Contracts or Leases**

Any person or entity claiming rights under an executory contract or unexpired lease that is rejected pursuant to the provisions of this Plan shall have until thirty (30) days after the Confirmation Date to file a Proof of Claim, or such additional time as the Court, on request of a party-in-interest only before the expiration of such 30-day period, may for cause allow. Each Debtor, Creditor and Party in Interest shall have ninety (90) days after the Effective Date to object to those Claims.

## AA. RETENTION OF CLAIMS OF THE DEBTORS

**Retention of General Claims and Settlement Rights of Claims**

Except as hereinafter provided, as to any Claim or cause of action which can be retained and enforced by each Revested Debtor and which shall not have been settled or adjusted by this Plan, each Revested Debtor shall retain the right to enforce or settle such Claim or cause of action for its benefit subject to the terms of this Plan. CREDITORS AND PARTIES IN INTEREST ARE HEREBY NOTIFIED THAT CLAIM ALLOWANCE IN AND OF ITSELF IS NOT A RELEASE OF ANY CLAIM OF DEBTORS AGAINST SUCH THIRD PARTY.

**Retention of the Administrative Claims Objections**

Each Debtor, as the Revested Debtor, specifically retains all rights, claims, causes of action, remedies, and property rights (whether tangible or intangible) against third parties. Each Revested Debtor shall retain the right to enforce or settle such Claim or cause of action for its benefit subject to the pledge of assets herein to secure payment under this Plan and shall retain the right to object to Administrative Claims filed.

## BB. MODIFICATION

**Prior To Confirmation**

The Debtors may propose amendments or modifications to this Plan at any time prior to the entry of the Order Confirming the Plan, with leave of the Court and

upon notice to parties in interest as may be deemed necessary by the Court. Modifications or amendments to the Plan, which are agreed to, or unopposed by, any effected Creditor or Creditor Class, and which amendment or modification does not have a material adverse effect on the feasibility of the Plan, may be approved by the Bankruptcy Court without notice, other than the notice of this provision, the proffers of terms, written evidence or other testimony regarding such amendment or modification, and the opportunities to be heard at the hearing on Confirmation of the Plan as provided by law or this Plan. At the Confirmation Hearing, Debtors or each Revested Debtor may, either in writing or upon oral motion, request a modification of any provision of the Plan to address any objection to confirmation of the Plan and may seek confirmation of the Plan, as modified.

## After Confirmation

After the date of the entry of the Order Confirming the Plan, Revested Debtor may, with approval of the Court and so long as it does not materially or adversely affect the interest of Creditors, remedy any defects, omissions or reconcile any inconsistencies in the Plan or in the Order Confirming the Plan in such a manner as may be necessary to carry out the purpose and effect of this Plan. After the date of the entry of the Order Confirming the Plan, each Revested Debtor may modify the Plan at any time after Confirmation and before Substantial Consummation of the Plan, but it may not modify the Plan so that it, as modified, fails to meet the requirements of Chapter 11 of the U.S. Bankruptcy Code. The Plan as modified becomes the Plan only if circumstances warrant the modification and the Court, after notice and a hearing, confirms the Plan as modified under §1129 of the Bankruptcy Code.

## CC.   MEANS FOR EXECUTION

## Court Approval of the Plan and Disclosure Statement

The Plan shall become effective upon the Effective Date, provided the Court has approved the Disclosure Statement by Order and has entered an Order Confirming the Plan, in accordance with the provisions of the Bankruptcy Code.

## Delivery of Plan Assets to Disbursing Agent

### A.   Funding of the Plan

The Debtors, shall deliver from time to time to the Disbursing Agent or the Fund Representative all required funds for payments to Allowed Claims, on or prior to the Effective Date of the Plan and thereafter from time to time as Fund assets come into the hands of the respective Revested Debtor. Title to any Distributable Asset pledged by the Debtors to secure performance under the terms of this Plan shall remain in the name of each Revested Debtor, subject to performance and payment.

### B.   The General Unsecured Liquidation Fund

The General Unsecured Liquidation Fund shall be funded as follows:

1. 60% of all cash on hand on the Effective Date, or $1.1Million Dollars, which ever is more
2. 100% of the proceeds from any Litigation Asset.
3. 25% of any Net After Tax Profit from the operations of either of the Revested Debtors.

Any excess of funds in the General Unsecured Liquidation Fund after all Allowed Claims are paid in full, shall be Used to pay pro rata, until paid in full all Allowed Insider Claims, then go to the Revested Debtor free of any Claims.

On the Effective Date, the Plan shall be implemented under the supervision of Disbursing Agent, who shall assume duties on the Effective Date as Fund Representative to administer the General Unsecured Liquidation Fund (the "Fund"). To the extent the Fund Representative incurs any expenses in operations and administration of the Fund he shall be entitled to reimbursement from the Fund without need for approval of the Bankruptcy Court; however, the Fund Representative will not be entitled to any salary in compensation for performance of his duties in administering the Fund. The Fund Representative is not a fiduciary to parties with Allowed General Unsecured Claims that may be entitled to payments, if any, from the Fund. The duties and powers of the Fund Representative shall include all powers necessary to implement the Plan and administer claims that participate in the Fund, including but not limited to, the following: (i) to compromise, dismiss or pursue in litigation any and all Claims of the Debtor and its Creditors pending or existing at Confirmation that are dealt with in the Fund; (ii) to retain professionals to assist in performing duties related to the Fund and otherwise hereunder; (iii) to object to Claims; (iv) to calculate and prepare at least annually a report on the assets and activities of the Fund; (iv) to safeguard the assets of the Fund; (v) to make distributions from the Fund, if any, as appropriate.

In the event the Fund Representative is unable to serve or the position is vacated, a successor Fund representative shall be appointed within 30 days by the person or persons in control of Canyon Port Holdings, LLC. Such successor shall be required to disclose in a pleading filed in the bankruptcy case his or her connections, if any, to the Debtor, Creditors, and any other party-in-interest and to the United States Trustee for the Southern District of Texas, Corpus Christi Division.

The decision of whether or not to pursue any claim, objection, or litigation at all or to compromise Claims once they have been asserted shall be made by the Fund Representative in his sole discretion.

The Fund Representative shall be indemnified and defended (including defense costs), for any and all liabilities incurred or claims made as a result of acts taken in connection with the Fund, other than gross negligence or willful misconduct. The Fund Representative shall be entitled to use assets of the Fund to effect the purpose of this provision. Such expenses, if any, shall be reported on a Monthly basis to the Creditor's Committee, to the extent that Committee continues to exist after Confirmation OR at least an annual basis to parties with Allowed General Unsecured

Claims.

### a) Timing of Distributions From the Fund

Distributions to Creditors participating in the Fund shall be made from any Fund assets in the hands of the Fund Representative from time to time at his or her sole discretion, and may or may not include interim distributions. Prior to resolution of the Litigation, the Fund Representative shall retain all assets of the Fund in a separate account, provided that, the Fund Representative may from such assets pay reimbursable expenses and compensation of such counsel, experts, advisors, and other professionals deemed necessary within the discretion of the Fund Representative to manage the assets of and claims against the Fund.

### b) Corporate Action

Each of the matters provided for under the Plan involving the corporate structure of the Debtor or corporate action to be taken by, or required of, the Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement or further action by stockholders, directors or members, of the Debtor. On or after the Effective Date, the Managers of the Revested Debtor shall be authorized and directed to take all necessary and appropriate actions to effectuate the transactions contemplated by the Plan.

### c) Avoidance Actions

The Fund Representative is empowered to pursue the estate's avoidance or fraudulent transfer claims for the benefit of the Creditors. The Fund Representative is entitled to retain professionals as necessary for this purpose. Expenses and fees for pursuing such claims by the Fund Representative will be paid by the Fund Representative out of the assets of the Fund.

Except for any claims that are Litigation Assets as described in the Disclosure Statement which is incorporated by reference for purposes of this provision, the Fund Representative has no current intent to pursue any avoidance or fraudulent transfer claims.

## 1. Participation In Distributions - Timely Objections to Claims

### d) Participation.

Any entity, including a Creditor, Interest Holder or Party in Interest to each such particular Debtor, who has not, within the time provided in the Plan or any Final Order of the Court, performed any material act required in the Plan or in such Final Order, shall not participate in any distribution under this Plan.

### e) Distributions.

No distribution shall be made upon Claims except pursuant to an order, which has become a Final Order arising out of an Application to authorize payment, a contested matter or an adversary proceeding filed in this Court. Nothing herein, however, shall preclude payment of Operating Expenses without Court order.

### f) Objections.

---

Disclosure Statement                    27

The Debtors or Revested Debtor shall be authorized to file and prosecute objections to the Allowance of any Claims. Upon application filed within the time so limited and for cause shown, the Court may extend such period for a reasonable time under the circumstances with respect to any such Claim. If no Objection is filed within the time so limited to the Allowance of any Claim duly proved, such Claim shall be deemed Allowed in the amount in which it is proved and the holder of such Claim shall be entitled to obtain a distribution order thereon. The time limit for filing objections shall be 180 days after the Effective Date of the Plan, unless otherwise set by the Court after the Confirmation hearing. The Debtors shall prosecute any Objection pending after Confirmation. The expenses of prosecution of such Objection, if done with the consent of the Disbursing Agent shall be borne by the Fund.

### 2. Conditions Precedent to Distributions to Creditors

Any Creditor, entity, assignee of a Creditor's Claim, Interest Holder or other party in interest to each such particular Debtor, who has not, within the time provided in the Plan or any Final Order of the Court, performed any material act required in the Plan or in such Final Order, shall not participate in any distribution under this Plan until such performance is rendered. No distribution shall be made upon Claims under this Plan until Final Order has allowed such Claim or as deemed Allowed in this Plan or in the Bankruptcy Code; provided, however, nothing herein shall preclude payment of Operating Expenses without Court order.

### 3. Partial Payments

A.      Partial payments may be made to any Class not otherwise restricted from receiving such payments, so long as

(i) no payments are made to any Class of each Debtor entitled to receive funds from such Debtor's estate or Disbursing Agent which are inferior in priority under the terms of this Plan until prior Class(as) from such respective Debtor has been paid in full or its timely payment has been made in accordance with this Plan; or

  (ii) sums are being withheld sufficient to pay such Claims of the prior Class in full.

B.      Partial distributions may be made to any inferior Class of Creditors without withholding sums sufficient to pay the contingent or unliquidated deficiency of any prior Class where

  (i) a prior Class must first liquidate property, Property of the Estate, or Creditor Assets held as security, even though such prior Class may not be paid in full but has not liquidated its deficiency; or

  (ii) where the Plan provides that a Creditor is entitled to a distribution after a particular time or event but not before; or

  (iii) where the payment to the inferior Class is authorized to be made from unencumbered assets.

---

C.    Such Distribution attributable to any disputed, unliquidated or contingent Claim, if required to be withheld, shall be withheld and deposited in an interest bearing account until such disputed, unliquidated or contingent Claim is finally resolved by Final Order of the Court.

### 4. Creditor Assets Remaining After Payment in Full

Any property, Property of the Estate, or Creditor Assets or Monies, or funds remaining after all Allowed Claims in all Classes have been paid in full shall be returned to each Revested Debtor free of all Claims.    Any lien of record or recorded claim of lien remaining after the Confirmation Date, and not expressly approved, affirmed, or created by the terms of this Plan shall be immediately released of record at the expense of each Revested Debtor.

### 5. Debtors' Right to Written Releases

Before each Revested Debtor tenders final payment in full, in kind or in cash, to a Creditor pursuant with an Allowed Claim, each Revested Debtor shall be entitled to demand and receive a full written release of liability executed by the Creditor and delivered to each Revested Debtor. Failure to seek or receive such a written release does not in any manner reinstate the Discharge provided by this Plan and § 1141 of the Bankruptcy Code. In the event such liens are not released of record upon request of the Revested Debtor by any such lien holder, and a proceeding is filed in Bankruptcy Court or any other Court having jurisdiction over the subject matter and parties, the Revested Debtor shall be entitled to recover their reasonable attorneys fees for obtaining a judgment releasing such liens, claims or encumbrances.

### 6. Avoidance or other Bankruptcy Litigation

All Avoidance Actions, preference actions, fraudulent transfer actions, and the like are expressly preserved to the Revested Debtor and if any such claims are discovered, the Revested Debtor shall have sole discretion to pursue and/or settle such claims.

### 7. Duration of Estate

The Plan shall become effective upon the Effective Date. Thereupon, the provisions of the Plan shall remain and continue in full force and effect until all of the Claims of Creditors are paid pursuant to the provisions of the Plan.

After substantial consummation, the Revested Debtor may file with the Court a report thereof, seek the entry of a Final Decree, and provide notice thereof to all Creditors and Interest Holders entitled to notice pursuant to the Rules.

### 8. Treatment Of Claims By Agreement, Waivers, Etc.

Disclosure Statement                                          29

Any Claim in any Class may be treated in accordance with any agreement (including a settlement or compromise) for waiver, deferral, installment payment or other negotiated treatment as agreed between the holder of any such Claim or interest and each such particular Debtor (except that each such particular Debtor shall not agree to pay a Creditor a greater amount than the Creditors' Allowed Claim), after Confirmation and as long as such treatment is not superior to the treatment of Creditors in the same or superior Classes.

## DD. POST-CONFIRMATION OPERATIONS OF THE DEBTOR

### Vesting of Property

Title to the property, real or personal, of Debtors' Estates shall vest in Canyon Port Holdings, LLC on the Effective Date of the Plan, subject only to Allowed Claims and the terms of this Plan.

### Disbursing Agent

Unless otherwise set out in the Order of Confirmation, Larry Ramming shall be the Disbursing Agent in respect to distributions from property of the revested Debtor's estate. The Disbursing Agent will serve in this capacity without bond and without compensation for the duties of the Disbursing Agent. The Disbursing Agent shall be bound by the terms and provisions of this Plan, as modified, and shall be entitled to reconcile any deficiency or conflict of terms to implement the purpose of payment of all Claims under this Plan.

### Continuation of the business of the Debtors by Revested Debtor After Confirmation – Intercompany loans

The Revested Debtor shall operate the business after Confirmation of the Plan.

### Management

The Revested Debtor will not at any time during the duration of the Plan, operate the business under management which is adverse to the interest of the Creditors or the efforts of the Disbursing Agent, and will not otherwise operate the business in a manner which is adverse to the interest of the Creditors' rights, and The Revested Debtor shall take reasonable steps to make corrective changes in any management, as soon as practical upon receipt of written notice by any Creditor that the Creditor considers said executive management or such other action taken, or refused to be taken, adverse to the interest of the Creditors. The Revested Debtor shall continue its current management.

### Assist Disbursing Agent

The Revested Debtor will assist the Disbursing Agent in all reasonable efforts to pay the Claims of Creditors.

### Professional Fees

Professional Fees accrued after the Confirmation Date may be paid from Plan Assets without prior court approval.

### Management Compensation

Disclosure Statement                                        30

Although there is no restriction in this Plan or in the By-Laws, Articles of Incorporation, or particular shareholder minutes concerning the salaries, bonuses, benefits, or the like paid to management, The Revested Debtor shall not compensate its officers or directors more than is reasonable and customary for business employees in the same or similar industry and market, of the same or similar size, or in accordance with the budget projections attached to the Disclosure Statement, whichever amount is higher. The management shall be governed by the business judgment rule applicable at common law in Texas, in making their determinations and decisions regarding compensation to all officers, directors, and employees and such compensation shall be an Operating Expense.

### Revested Debtor's Books and Records

Revested Debtor shall keep such books of account or any other records of its acts, property, the Fund and transactions as may be required by law and in accordance with generally accepted accounting practice.

RELEASES AND ALTERATION OF THE RIGHTS OF, AND WITH RESPECT TO, THIRD PARTIES

## EE.    THIRD PARTY RELEASES

There are no third party releases except to the extent that delivery of property, Property of the Estate, Fund Assets or other payment of a Claim pursuant to the Plan may constitute payment and results in release of any third parties under applicable State or Federal law.

## FF.    RELEASES OF LIENS, CLAIMS AND CAUSES OF ACTIONS ALLOWED SECURED CLAIMS

The lien securing any Allowed Secured Claim shall be deemed to be released and discharged in its entirety when the Allowed Secured Claim secured by such lien has been paid in full.  Upon such payment in full, the holder of such Allowed Secured Claim shall execute and deliver such instruments as may be reasonably requested by the Revested Debtor, in order to reflect such release and discharge on the appropriate land or public filing records.

### Guarantees; Indemnities; Notes; Bonds; Etc.

All Claims and causes of action based upon guarantees of collection, payment or performance, indemnity or performance bonds, promissory notes, or other similar undertakings made or given by each the Debtors as to the obligations or performance of any other person shall be discharged, released and of no further force and effect, except as otherwise provided in this Plan.

### Release Upon Payment

All consideration and payments provided under this Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claim. Debts, and liabilities of any nature whatsoever against the Debtors or any of their assets or properties; and except as may be otherwise provided herein, upon the Confirmation Date, all Claims that existed on the Confirmation Date against the

---

Disclosure Statement                              31

Debtors shall be satisfied, discharged, and released in full; and all claimants, holders of Claims and all Creditors shall be precluded from asserting against the Debtors and Revested Debtor, its assets, properties, or interests held by it, any other or future Claim based upon any transaction arising on or prior to the Confirmation Date.

## GG.  MUTUAL PARTY RELEASES

All Creditors, claimants and Interest Holders in each such particular Debtor receiving payment or distributions pursuant to the Plan, in consideration for the promises and obligations of the Debtors under the Plan, shall be deemed to have waived, released, and discharged all rights or Claims, which they had or might have had against the Debtors.

## HH.  EXCULPATIONS

To the fullest extent permissible under all applicable law, the Debtors and Reorganized Debtors and any officers, directors, members, managers, agents, representatives, and attorneys for same, shall neither have nor incur any liability to any entity including, specifically, any holder of a Claim or Interest for any act taken or admitted to be taken in connection with or related to the prosecution of these Chapter 11 Cases, the formulation, preparation, dissemination, implementation, Confirmation or consummation of any Plan, any Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement or document created or entered into, or any other act taken or omitted to be taken in connection with the Chapter 11 Cases, any settlement agreement, purchase offer (whether accepted or rejected), any Plan, any Disclosure Statement, or the Confirmation Order, including solicitation of acceptance of any Plan.

## II.  RESERVATION OF RIGHTS BY THE DEBTORS

Neither the filing of the Plan, nor any statement or provision contained herein, nor the taking by the Debtors, the Revested Debtor, or any Creditor or any Interest Holder of any action with respect to the Plan shall

(i) Be or be deemed to be an admission against interest; and

(ii) Until the Final Decree, be or be deemed to be a waiver of any rights, which the Debtors might have against any Creditor or Interest Holder, and until the Final Decree all such rights are expressly and specifically reserved.

(ii) In the event that the Effective Date does not occur, neither the Plan nor any statement contained therein may be used or relied upon in any manner in any suit, action, proceeding or controversy within or outside of the Reorganization Case.

CREDITORS AND PARTIES IN INTEREST ARE HEREBY NOTIFIED THAT CLAIM ALLOWANCE IN AND OF ITSELF IS NOT A RELEASE OF ANY CLAIM OF DEBTORS AGAINST SUCH CREDITOR.

## JJ.  DEFAULT

Disclosure Statement                                32

### 1. Events of Default

The Revested Debtor shall deem the occurrence of any of the following events a default under this Plan. Upon the occurrence of any of the following, a Creditor may elect to declare a default by written notice to Revested Debtor (hereinafter "Declared Default").

A.    The respective Revested Debtor's failure to timely pay any installments required by this Plan, within twenty (30) days of the respective due date thereof, over to the Disbursing Agent or the respective Creditors, as the case may be; or

B.    The respective Revested Debtor's material breach of any of the other covenants, terms, or conditions of this Plan, and failure to cure within the time provided by this Plan or as provided by any loan documents evidencing or documenting an Allowed Secured Claim.

### 2. Declared Default

In the event of a default of any of the provisions of this Plan other than a monetary default, the Revested Debtor is entitled to notice of such claimed default, and shall have cured same to the reasonable satisfaction of the party entitled to performance within 30 days of the notice, provided however, such default having been declared by a Creditor and all time for curing such "Declared Default" having expired with the Declared Default not having been reasonably cured, any Creditor with an Allowed Claim may exercise any and all rights and remedies of a creditor under the laws of the state of Texas and the United States of America, including acceleration of any debts, and the filing of lawsuits (to collect the Plan payments made the subject of the Declared Default) against each Revested Debtor.

## KK.   TRANSFER OF CLAIMS

In the event that any Creditor shall transfer its Claim, it shall do so only until the Final Decree, in compliance with Bankruptcy Rule 3001, and it shall promptly notify the Joint Debtor or each Revested Debtor in writing of such transfer. The Debtor or Revested Debtor shall be entitled to assume that no such transfer of any such Claim has been made by any such Creditor until after such compliance and receipt of such notice. Each transferee of any Claim shall take such Claim subject to the provisions of the Plan and to any request made, waiver or consent given or other action taken under the Plan; and, except as expressly otherwise provided in such notice, each such particular Debtor shall be entitled to assume conclusively that the transferee named in such notice shall thereafter be vested with all rights and powers under the Plan of the transferor with respect thereto.

## LL.   ACCEPTANCE OF THE PLAN AND BINDING EFFECT OF IMPAIRED DESIGNATION

Creditors holding Claims included in the Classes of Claims under this Plan (except for Classes that are unimpaired) shall be requested to accept or reject the Plan. If any Class of Creditors fails to accept this Plan by the requisite majorities in number and amount required under Section 1126 of the Code, the provisions of Section 1129(b) of the Code may be invoked on motion of the proponent in order to secure

Confirmation of the Plan. The scheduling of a Claim or Class of Claims as impaired shall not bind each such particular Debtor so as to require voting by such Class in the event that the Bankruptcy Court shall determine that such Claim is, in fact, not impaired.

## MM. EFFECT OF CONFIRMATION - INJUNCTION FROM ENFORCEMENT OF ANY PRECONFIRMATION DEBT AND SECURITY INTEREST

Upon and after the date of the Order Confirming Plan, the provisions of the Plan shall: (i) bind each such particular Debtor and all Creditors and Interest Holders whether or not any Creditor or Interest Holder is impaired under the Plan, or has accepted the Plan, or has voted on the Plan, or holds an Allowed Claim, or has otherwise participated in this Chapter 11 case or had actual notice of this Chapter 11 Case and (ii) discharge all Debts and Claims pursuant to § 1141 of the Bankruptcy Code and the provisions of this Plan.

Confirmation of the Plan shall effect a permanent injunction against the commencement or continuation of any action, the employment of any process, or the taking of any other act to collect, recover or offset against Debtors, the Revested Debtor's property revested on the Effective Date, its or the Debtors' Representatives or any of the Property of the Estate, any pre-confirmation obligation, Debt or Claim and/ or any pre-confirmation lien, security interest or judgment, except any lien created for, or arising under, the Plan for a Debt, Claim or obligation arising under the Plan. The Confirmation Order will contain such injunctive provisions as are necessary and appropriate to carry out the terms of the Plan.

## NN. NOTICES

Notices required to be given hereunder shall be given by certified mail, return receipt requested, and shall be deemed served upon receipt, as follows:

### A. Debtors

TO DEBTORS:
Attn: Larry Ramming
5005 Riverway, Suite 250
Houston, TX 77056


WITH A COPY TO:
Harlin Womble
Jordan, Hyden, Womble, Culbreth & Holzer, P.C.
500 N. Shoreline, Suite 900
Corpus Christi, Texas  78401-0341

TO CREDITORS COMMITTEE
Patrick Autry
Branscomb PC
99001 IH-10 West, Suite 800
San Antonio, TX  78230

### Amendment to Notices

Any party to whom notice is directed under this Plan may change the address of such notice only by filing with the United States Bankruptcy Court a Notice of Change of Address, and service of such notice in accordance with the service list of Creditors and Parties in Interest at the time of Confirmation but including any other Creditors or Parties In Interest notifying the Bankruptcy Clerk and each such particular Debtor or Revested Debtor of inclusion on such service list. Only notice served in compliance with this provision of the Plan will be deemed effective as notice under this Plan.

### B.    Discharge Of Debts And General Provisions

The effect of Confirmation of the Plan shall be to discharge and fully satisfy all Debt, liabilities, and obligations of the Debtors (including all penalties, fines or forfeitures, and damages) that arose before the Confirmation Date, except as otherwise specifically provided in the Plan or the Order Confirming Plan, pursuant to and as provided in § 1141(d) of the Bankruptcy Code (which are not expressly inconsistent with the provisions of this Plan) and the terms of this Plan, and whether or not such Claim is Allowed or paid pursuant to this Plan. Upon Confirmation, the Plan shall discharge all Claims against and liabilities of the Debtors which are dischargeable by a Debtor in a case under 11 U.S.C. § 101, et seq. The Plan is deemed to be an operating Plan, not a liquidating Plan, as continued operation of the property interest is set forth herein, and all Creditors and Persons will continue to be stayed from proceeding against each such particular Debtor or its assets.

**IT IS THE INTENTION OF THIS PLAN THAT ONCE CONFIRMATION OCCURS, THE DEBTORS WILL BE FULLY, FINALLY, AND COMPLETELY DISCHARGED FROM ALL LIABILITIES AND OBLIGATIONS, INCLUDING CLAIMS AND DEBTS, AND THE REVESTED DEBTOR SHALL BE REVESTED WITH ALL PROPERTY OF THE ESTATE AS HEREIN PROVIDED FREE FROM SUCH PRE-PETITION DEBTS, CLAIMS AND LIENS, EXCEPT AS TO THOSE LIENS HEREIN PROVIDED.**

Upon Confirmation, title to all assets and properties whatsoever of the Debtors and Debtors in Possession shall be retained by and revested in each Revested Debtor Canyon Port Holdings, LLC, free and clear of all claims, liens, security and equitable interests, except as specifically set forth in this Plan. All Claims, liens, or lien Claims shall be discharged and released of record by this Plan at Confirmation, except as specifically provided otherwise in the Plan.

The Order Confirming Plan shall be a judicial determination of, and a contract for, the discharge of the Debts and liens arising from any Claims or Debt against each such particular Affiliate's, Debtor's and Revested Debtor's Estate property.

### C.    Allowance Of Attorneys Fees, Costs And Expenses In Certain Litigation

In the event of post Confirmation litigation between any Revested Debtor or Canyon Port Holdings, LLC and any party in interest, Creditor, Person, holder of a Debt, or Interest Holder concerning or relating to the Plan, including without limitation, collection matters, matters over which this Court retained jurisdiction, each Revested Debtor or Canyon Port Holdings, LLC shall recover from the opposing party its reasonable attorneys' fees, costs and expenses incurred in connection with such matters to the extent that the Court determines that each Revested Debtor prevailed in the matter. In this context "prevailed" shall include, without limitation:

a.    That a claim has been disallowed or subordinated in whole or in part; or

b.    That an avoidable transfer has been avoided in whole or in part; or

c.    That any declaratory judgment or interpleader claim was resolved substantially in favor of each Revested Debtor; or

d.    That any claim concerning default under the Plan is found not to be a Declared Default; or

e.    Any claim for enforcement of a provision of the Plan brought by or against a Person found to be bound by such Plan Provision.

A motion may be filed by each Revested Debtor with the Court to determine the amount and extent of the liability of any Person under this provision; or, such action for Attorneys fees, costs and expenses may be brought in the primary action, at the sole discretion of each Revested Debtor. The right of each Revested Debtor to attorney's fees, costs and expenses is a contractual agreement between each Revested Debtor and any Creditor or Party in Interest is in addition to any such right under any applicable law.

## D.    Jurisdiction Retained By The Bankruptcy Court

### 1.    Prior to Case Being Closed

The Court shall retain jurisdiction and/or exercise exclusive jurisdiction of this Reorganization Case after the entry of the Order Confirming Plan until all transfers and payments called for under the Plan have been made and until entry of the Final Decree with respect to any of the following matters:

A.    To estimate, subordinate pursuant to § 510, Allow or disallow any Claim (including any Claim arising from the rejection of any executory contract) or interest and any Objection to any Claim or interest;

B.    To enter and implement such orders as may be appropriate in the event the Order Confirming Plan is for any reason stayed, reversed, revoked or vacated;

C.    To adjudicate all controversies arising during the pendency of the Reorganization Case;

D.    To make such orders as are necessary or appropriate to carry out the provisions of the Plan;

---

Disclosure Statement                                    36

E.     To hear and determine matters concerning state, local and federal taxes pursuant to Sections 346, 505, 525 and 1146 of the Bankruptcy Code;

F.     To continue to hear any pending Objection, Contested Matter, or Adversary Proceeding brought during the Chapter 11 case, or removed to the Bankruptcy Court during the Chapter 11 case;

G.     To hear any Objection, Contested Matter, or Adversary proceeding pending on the Confirmation Date, or brought either before or after the Confirmation Date and removed to the Bankruptcy Court after the Confirmation Date but before closing of the case, to the full extent that the Bankruptcy Court has jurisdiction to hear such matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157 and applicable case law, or to the extent that such action has any conceivable impact upon the administration of each Revested Debtor in performing its obligations under this Plan or with respect to the revested Property of the Estate, including, but not limited to the following:

1.     To classify the Claims of any Creditors and the treatment of these Claims under the Plan;

2.     To re-examine Claims, which may have been allowed for purposes of voting, and to determine objections, which may be filed to any Claims;

3.     To enter orders regarding release of liens or Claims against the estate, and to determine the respective rights of each Revested Debtor, the Debtors and any Creditors regarding such lien claims, including liens affirmed, ratified, or created by this Plan.

H.     To hear and determine all controversies, suits and disputes that may arise in connection with the interpretation or enforcement of the Plan;

I.     To hear and determine all requests for compensation and/or reimbursement of expenses which may be made for pre-confirmation Professional Fees, and with respect to any such application or work performed by any such professional;

J.     To correct any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order;

K.     To determine all questions and disputes regarding (i) title to the assets of the Debtors or each Revested Debtor received as a result of Confirmation of this Plan.

L.     To issues orders approving any sale of any asset proposed to be sold herein by either Revested Debtor or to conduct hearings to determine the scope, and amount, and provisions for the sale free and clear of any liens, claims and encumbrances as to any Plan Asset.

M.     To enforce the Confirmation Order, the Final Decree, and all injunctions herein or therein;

N.     To ensure the Plan is carried out, and to enter the Final Decree.

### 2. After Closing of the Case

After this case is closed, the Court shall retain jurisdiction to enforce, by injunction or otherwise, the provisions provided for within this Plan, the Confirmation Order, and any Final Order or Final Decree.

## E.    General Provisions

### 1. Injunctions

The Confirmation Order shall contain such injunctions and other orders as may be necessary to implement and carry out the Plan as approved and confirmed.

### 2. Section 1129(B)

If any Class of Creditors or Interest Holders fails to accept the Plan by the requisite majorities in number and amount required by Section 1126 of the Bankruptcy Code, the provisions of Section 1129(b) of the Bankruptcy Code may be invoked at the request of each such particular Debtors at the Confirmation Hearing, and such request may be made orally, and shall be deemed to have been timely and properly made upon entry of the Confirmation Order.

### 3. Bankruptcy Rule 9006

Bankruptcy Rule 9006 is incorporated herein for purposes of calculating the dates set out herein.

### 4. Disbursing Agents Obligation Regarding Addresses

The Disbursing Agent shall have no obligation to search for new addresses of Creditors whose distributions on Allowed Claims are returned. The Disbursing Agent may rely exclusively upon the addresses contained (i) in the Debtors' schedules, if a Creditor did not file a proof of claim; (ii) in a Creditor's proof of claim; or (iii) in any timely written notice provided to the Disbursing Agent after the Effective Date by a Creditor. No other addresses need be sought. Any distribution undeliverable after consideration of such three possible addresses shall be forever waived. Any distribution checks that have not been negotiated within 90 days of issuance shall be canceled, and such respective Creditor's distribution shall be forever waived.

### 5. Tax Identification Number

The Disbursing Agent may suspend distribution to any Creditor that has not provided its Federal Tax Identification number or Social Security number, as the case may be.

### 6. Bankruptcy Code And Texas Law Control

To the extent not governed by the Bankruptcy Code, Texas law shall govern the provisions of the Plan.

---

Disclosure Statement                                            38

#### 7. Admissions Or Use In Litigation

Debtors are, and may continue to be, in litigation with certain Creditors or parties-in-interest. To the extent that such litigation deals with issues or transactions involved in such litigation, nothing in this Plan (or the approved or any proposed Plan or Disclosure Statement): (i) shall be deemed an admission of any fact contested by each such particular Debtor; (ii) shall be admitted in evidence in any such proceeding as an admission of a fact contested by each such particular Debtor.

#### 8. Confirmation Order - Rule 7062 and Rule 9014

To the extent necessary, the Confirmation Order will contain any provisions necessary to provide for the substantial consummation of the Plan on the Effective Date, including, but not limited to designating Bankruptcy Rule 7062 not applicable to the Confirmation Order by virtue of Bankruptcy Rule 9014.

#### 9. Substantial Consummation

The Plan shall be deemed substantially consummated upon the completion of all actions required to be undertaken by the Debtors as of the Effective Date of the Plan. Upon substantial consummation, Debtors or each Revested Debtor may move for a Final Decree closing the cases and requesting such other orders as may be just.

#### 10. Preservation of Causes of Action

Except as otherwise provided in this Plan, all Causes of Action shall be preserved.

### DEBTORS' REQUEST FOR APPROVAL

WHEREFORE, each respective Debtors submit this Disclosure Statement and the information contained therein, in good faith, in accordance with the provision of Title 11, U.S.C. § 101, *et seq.*, and § 1125, for approval of the Court and for consideration by Creditors and other Parties-in-Interest with respect to voting on the proposed Plan, and as the sole source of information furnished by the Debtors, or to be furnished by the Debtors, in solicitation of acceptance of the Debtors' Consolidated Plan of Reorganization.

DATED: January 14, 2013

Canyon Port Holdings, LLC and Canyon Supply & Logistics, LLC

By: */s/ Larry Ramming* _____
    Larry Ramming, Manager

---

Disclosure Statement               39